UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED
MAR 04 2008

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| DAVID W. BURTON, | * | CIV. 06-4045 |
| Plaintiff, | * | |
| vs. | * | REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 47) |
| MIKE MULLER, Now Unit Manager Housing, Harmon Unit, Mike Durfee State Prison; and TOM HOOKER, Housing Staff Coordinator, Unit "C" Trustee Building, Sioux Falls; | * | |
| Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## BACKGROUND

Pending is defendants' unopposed motion for summary judgment (Doc. 47). Previously most of Mr. Burton's allegations were dismissed on screening, but he was allowed to assert retaliation claims (Doc. 22). An Order was filed directing Mr. Burton to file a single document entitled "Amended Complaint" to replace all of his previously filed claims. It was Ordered that his Amended Complaint should name only Mike Muller and Tom Hooker as defendants and should state exclusively his retaliation allegations (Doc. 31). Mr. Burton filed an Amended Complaint (Doc. 35). His Amended Complaint was served on October 13, 2006. A Scheduling Order was filed which established the motion deadline as April 30, 2007 (Doc. 43). Defendants filed a motion for summary judgment together with supporting affidavits, a statement of undisputed facts, documents, and a brief on April 30, 2007 (Docs. 47-55). Plaintiff has not responded. Plaintiff was paroled on December 14, 2006 (Doc. 48, p. 12, ¶ 47).

Because defendants' motion is unopposed, and because they are otherwise entitled to summary judgment on the merits for lack of proof of a constitutional violation, it is RECOMMENDED that defendants' motion for summary judgment should be GRANTED.

## UNDISPUTED FACTS

Following are the undisputed facts as stated by defendants in Doc. 48:

1. On April 7, 2003, Burton was convicted of grand theft in violation of SDCL § 22-30A-7. On April 11, 2003, he entered a guilty plea to being a habitual offender in violation of SDCL § 22-7-7. Burton was sentenced to fifteen years in prison, with seven suspended, and was given credit for time served. (Ripperda Aff., Ex. A at 0015-0022.)

2. Burton has a criminal history that, among other things, includes a Florida felony conviction for destroying evidence and Washington convictions for DWI, possession of stolen property, third-degree rape, and burglary. (Ripperda Aff., Ex. A at 0006-0014.)

3. Burton was incarcerated by the South Dakota Department of Corrections on May 20, 2003. He immediately went through intake and classification in Sioux Falls at the South Dakota State Penitentiary. (Ripperda Aff., Ex. A at 0001.)

4. Upon admission, Burton's initial parole date was calculated as December 3, 2006. (Ripperda Aff., Ex. A at 0004.)

5. Burton was initially classified as a low-medium security risk under the DOC's inmate classification system. During the intake and classification process, Burton was housed at the Jameson Annex. On June 13, 2003, Burton was assigned to the Mike Durfee State Prison (MDSP), a medium-security facility. (Ripperda Aff., Ex. A at 0001.)

6. Due to Burton's third-degree rape conviction, officials with the DOC's sex-offender treatment program (STOP) evaluated whether Burton should be required to complete sex-offender treatment as part of his rehabilitative programming in prison. STOP officials determined that Burton did not meet the criteria for required participation. Burton was assigned a code of 2N to indicate he was previously convicted of a sex crime, but was determined not to need treatment. (Ripperda Aff., Ex. A at 0054-0056.)

7. On December 4, 2004, Burton's security classification was lowered from low-medium to minimum. (Ripperda Aff., Ex. A at 0048-0049.)

8. After being reclassified as a minimum-security inmate, Burton was transferred to Unit C in Sioux Falls, which is a minimum-security housing unit. Unit C is also referred to as the trustee unit. Burton was housed in Unit C from January 13, 2005 through November 11, 2005. (Ripperda Aff., Ex. A at 0002, 0049; Kuemper Aff., ¶ 2; Muller Aff., ¶ 2.)

9. In mid-November, 2005, officials from the Kent Police Department in Kent, Washington, contacted the SDSP regarding their investigation into a cold case involving a rape and murder. Burton was a suspect, and they wanted to obtain a DNA sample from him as part of their investigation. (Kuemper Aff., ¶ 3.)

10. Because of the cold case investigation, prison officials considered Burton to be a flight risk. The classification panel reclassified Burton to low-medium status. Based on his reclassification, Burton was moved from Unit C to the SDSP's North Hall, a more secure housing unit. (Ripperda Aff., Ex. A at 0003, 0044.)

11. Associate Warden Bob Kuemper anticipated that the investigation would take some time because a DNA test was involved. Because of the expected length of the Washington

3

investigation, and to ensure that Burton had no opportunity for escape, Kuemper approved Burton's transfer from the SDSP to the MDSP pending completion of the investigation. Although a housing assignment at the SDSP would have addressed the need to place Burton in a more secure facility, Burton's security classifications did not require placement at the SDSP, which houses inmates with higher classifications than Burton's. Burton arrived at the MDSP on December 12, 2005. (Kuemper Aff., ¶ 4; *and see* Doc. 1.)

12. When Burton initially was assigned a sexual behavior code of 2N, when he was transferred from Unit C to the SDSP, and when he was transferred from the SDSP to the MDSP, inmates with a code of 2N could be housed at a minimum-security facility. (Kuemper Aff., ¶ 5.)

13. Defendant Mike Muller is employed by the DOC as a Unit Manager at the MDSP. Muller was Burton's Unit Manager while Burton was at the MDSP beginning on February 1, 2006, until he was later returned to Unit C in Sioux Falls on April 20, 2006. (Muller Aff., ¶ 1.)

14. After Burton was transferred to the MDSP, DOC policy was changed so that inmates with a code of 2N could no longer be housed at a minimum-security facility. When the policy was changed, Associate Warden Kuemper and other correctional officials reviewed inmate records, identified inmates with a code of 2N, and confirmed that their housing assignments were appropriate. Any inmates with a code of 2N who were housed at a minimum-security facility were transferred to a more secure facility. (Kuemper Aff., ¶ 5.)

15. On January 5, 2006, Burton was placed in a segregation cell in East Crawford at the MDSP pending the results of his DNA test. (Muller Aff., ¶ 3; Ripperda Aff., Ex. A at 0003.)

16. Burton filed a grievance on January 6, 2006, complaining about being placed in segregation. Burton was told he had been placed in segregation pending the results of his DNA test

and, depending upon the result, would either be transferred to Unit C, housed at the MDSP, or sent to the SDSP. (Ripperda Aff., Ex. A at 0149-0152.)

17. Burton appealed the grievance response using the DOC's administrative-remedy process. Burton, again, complained about being placed in segregation. Warden Dooley denied Burton's grievance on January 17, 2006. Warden Dooley explained to Burton that his placement in segregation was temporary, and the results of the DNA test would determine his long-term housing assignment. (Ripperda Aff., Ex. A at 0149.)

18. The DNA test cleared Burton of any complicity in the Washington case, and he was released from segregation on January 18, 2006. Burton was assigned to Harmon Hall. (Muller Aff., ¶ 4.)

19. Muller notified Burton of the change in DOC policy affecting housing assignments of inmates with a code of 2N either just before, or just after, Burton was released from segregation. Muller explained that due to changes in DOC policy he might not be eligible to return to Unit C. Muller also told Burton that his code would most likely be reviewed by the sex-offender treatment staff. (Muller Aff., ¶¶ 5, 6; Ripperda Aff., Ex. A at 0003.)

20. On January 17, 2006, Associate Warden Kuemper sent an e-mail to Rick Leslie and Kris Peterson indicating that Burton had recently been cleared in the Washington investigation, but asked about his classification status, which affected where Burton could be housed. Prompted by Associate Warden Kuemper's e-mail, Rick Leslie asked Kris Peterson to have the sex-offender treatment staff consider Burton's sexual behavior code. (Kuemper Aff., ¶ 6; Ripperda Aff., Ex. A at 0041.)

21. On January 19, 2006, Burton filed a grievance stating that he had just been released from segregation a day earlier and Muller had told him that changes to DOC policy regarding housing assignments for sex offenders might preclude him from being returned to Unit C. In response to the grievance, Burton was told that his classification status as a sex offender was being reviewed in light of recent policy changes and he would be classified based upon the results of that review. (Ripperda Aff., Ex. A at 0131-0132.)

22. The sex-offender treatment staff reviewed Burton's status on January 20, 2006. Burton's sexual behavior code was changed to 3N, meaning that he could be housed in a minimum-security unit and, more specifically, Unit C in Sioux Falls. (Muller Aff., ¶ 7.)

23. The same day Burton's code was changed to 3N, the classification panel reviewed Burton's security classification and determined his final custody status to be minimum. Burton was assessed as not needing sex offender treatment, despite a third-degree rape conviction in 1985. Based on his reclassification, and the change in his coding from 2N to 3N, Burton was eligible to return to Unit C in Sioux Falls. Muller participated in the classification review, and agreed that Burton should be reclassified to minimum-security status and returned to Unit C. (Ripperda Aff., Ex. A at 0042; Muller Aff., ¶ 8.)

24. On January 20, 2006, Burton was notified he had been reclassified and would be returned to Unit C. (Ripperda Aff., Ex. A at 0177.)

25. On April 7, 2006, Burton filed several grievances complaining that he was still waiting to be returned to Unit C. Burton was told that he was on the list to be returned to Unit C and would be sent when there was an opening. Burton also complained that he had been written-up by Muller that day for being in his bed during a cell search, and he claimed the charge was false. Burton

6

asked that Muller be accompanied by another guard during any future searches of his cell. Burton's grievance complaining about the write-up from Muller was denied. (Ripperda Aff., Ex. A at 0116, 0142-0145.)

26. On April 10, 2006, Burton filed an informal resolution request complaining that Muller had told him on January 18, 2006, that his minimum-security classification would be restored and that he would be returned to Unit C within 6 weeks. According to Burton, he had prepared a grievance on this issue, but Muller had shredded the paperwork on January 18, saying that the issue had already been resolved. In his informal resolution request dated April 10, 2006, Burton did not give any details regarding the content of the grievance that Muller allegedly destroyed. In response to the April 10 grievance, Burton was told that he would be transferred to Unit C as soon as there was an available opening. (Ripperda Aff., Ex. A at 0117-0121.)

27. The factual claims Burton made in his April grievance contradict many of the factual claims made in his grievance dated January 19, 2006. The most obvious discrepancy being that, in the April grievance, Burton claimed that Muller had promised on January 18 that he would be returned to Unit C within six weeks. In the January grievance, Burton claimed he spoke to Muller on the 19th and Muller told him that his return to Unit C depended upon his sex-offender code; Burton made no reference to the conversation mentioned in the April grievance, nor did he complain about a grievance not being processed. (*See* Ripperda Aff., Ex. A at 0117-0121, 0131-0132.)

28. On April 13, 2006, Warden Dooley responded to Burton's grievances requesting that he be returned to Unit C. Warden Dooley explained to Burton that he would be transferred to Sioux Falls on the next available bus. (*See* Ripperda Aff., Ex. A at 0116.)

7

29. Burton filed a grievance on April 18, 2006, complaining about interference with his legal mail. Burton also complained that Mike Muller had maliciously removed him from an educational class because he was scheduled to be returned to Unit C in Sioux Falls. Burton complained that he was still waiting to be returned to Sioux Falls. (Ripperda Aff., Ex. A at 0097.)

30. Burton was transferred to Unit C in Sioux Falls on April 20, 2006. Burton could not be transferred to Unit C until then because space there was limited, as was space on the bus used to transport inmates between Springfield and Sioux Falls. Burton's transfer back to Unit C was not delayed between January 23, 2006, and April 20, 2006, for any reasons related to his classification. (Muller Aff., ¶ 9; Ripperda Aff., Ex. A at 0003.)

31. Burton's institutional file indicates that he received four disciplinary reports while in DOC custody:

    A. On January 7, 2004, Burton was written up for providing false information to prison staff. The matter was resolved informally.

    B. On April 7, 2006, Muller wrote a disciplinary report that Burton was sleeping in his bed during a room inspection. Muller issued Burton a verbal warning.

    C. On April 25, 2006, while at Unit C, Burton received a disciplinary report for wearing his shower shoes as regular footwear. Burton was issued a warning and provided appropriate footwear.

    D. On July 10, 2006, while at Unit C, Burton received a disciplinary report for having an extra spoon, coffee mug, and remote control. Burton was issued a warning.

(Ripperda Aff., Ex. A at 0062-0066.) Of these four disciplinary reports, Muller wrote one. (*Id.*)

32. On April 28, 2006, Burton filed a grievance complaining that, on April 27, 2006, he wanted to give documents to Sonny Walter of the Inmate Legal Assistance Office to receive help

related to a state habeas corpus action, but Defendant Tom Hooker told Burton he must mail these documents to Walter, and could not personally deliver the materials. Burton complained that this contradicted Walter's instructions that documents should not be mailed to him. Burton also claims that Hooker threatened to have Walter fired if Burton personally delivered the documents. In response to his grievance, Burton was told he could personally deliver the documents to Walter. (Ripperda Aff., Ex. A at 0114-0115.)

33. Hooker is employed by the DOC as a Training Specialist at the SDSP. He has held that position since July 1, 2006. Before that, he was the Unit Coordinator in Unit C, the trustee unit in Sioux Falls. He held that position from August, 2005, through June 30, 2006. (Hooker Aff., ¶ 1.)

34. Hooker never threatened Walter for providing legal assistance to, or receiving legal documents from, Burton. (Hooker Aff., ¶ 2; Walter Aff. ¶ 2)

35. Hooker never interfered with Burton's mail. (Hooker Aff., ¶ 3.)

36. Burton filed this action on March 1, 2006. His initial complaint asserted claims against several DOC employees, including Muller, and a Washington State police investigator. Hooker was not named as a party in Burton's original complaint. On March 1, 2006, Burton was housed at the MDSP awaiting transfer back to Unit C. (*See* Doc. 1.)

37. From April 11, 2006, through May 22, 2006, Burton filed ten separate requests with the Court to amend or supplement his complaint to add additional claims and parties. (*See* Docs. 8-17.)

38. Burton filed a motion to amend on April 11, 2006, complaining that Muller had issued him a malicious disciplinary report, which he claimed could affect his parole eligibility.

Burton explained that he was still appealing the write-up from Muller through the DOC's grievance process. (Doc. 8.)

39. On May 9, 2006, Burton wrote to the Court complaining that Hooker had threatened Walter and, as a consequence, Walter was no longer helping him with a pending habeas action. (Doc. 15.)

40. On May 23, 2006, Judge Simko screened the complaint pursuant to 28 U.S.C. § 1915 and recommended that the action be dismissed in its entirety. (Doc. 18.)

41. Burton filed a notarized objection to Judge Simko's report and recommendation. The objection was notarized by Hooker. (Doc. 21.)

42. On June 12, 2006, the Court adopted Judge Simko's report and recommendation, with the exception of Burton's allegations that Muller and Hooker retaliated against him for grievances he had filed. (Doc. 22.)

43. After the Court entered its order on the report and recommendation, Burton filed additional motions to amend and supplement his complaint to add claims and parties. (Docs. 24-30.)

44. On September 13, 2006, the Court ordered Burton to file a single amended complaint naming only Muller and Hooker as defendants. The Court directed that, other than the retaliation claims against Muller and Hooker, no other claims would be considered. The Court informed Burton that the amended complaint would replace all previously filed claims and, if a claim was not presented in the amended complaint, it would not be considered, even if it had been raised in an earlier filing. (Doc. 31.)

45. On September 25, 2006, Burton filed an amended complaint setting forth his claims against Muller and Hooker. Nowhere in the amended complaint does Burton indicate the capacity

10

in which Muller and Burton were being sued, nor does it contain a request for relief. The amended complaint is also unclear what action or actions by Muller and Hooker are being challenged as unconstitutional. (*See* Doc. 35.)

46. Although the action was filed on March 1, 2006, Muller and Hooker were first served on October 20, 2006. (Docs. 38-39.) They answered Burton's complaint four days later. (Doc. 40.)

47. Burton was paroled on December 14, 2006, and is not currently in DOC custody. (Ripperda, Aff. ¶ 3.)

An additional undisputed fact is that Muller did not shred any of Burton's grievances. (Doc. 51, p. 4, ¶ 14).

## DISCUSSION

### A. Summary Judgment Standard.

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Clark v. Kellog Co., 205 F.3d 1079, 1082 (8th Cir. 2000); Fed. R. Civ. P. 56(c). To avoid summary judgment, the non-moving party must "show that admissible evidence will be available at trial to establish a genuine issue of material fact." Churchill Business Credit, Inc. v. Pacific Mutual Door Co., 49 F.3d 1334, 1337 (8th Cir. 1995). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and by affidavit or otherwise designate specific facts showing that there is a genuine issue for trial." Commercial Union Ins. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992) (internal quotation marks and citations omitted). "Summary judgment is an extreme remedy, to be granted only when no genuine issue exists as to any material fact." Moore

11

v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997). While prisoners are entitled to the benefit of liberal construction of their pleadings because of their pro se status, Fed. R. Civ. P. 56 remains applicable to them. Quam v. Minnehaha County Jail, 821 F.2d 522 (8th Cir. 1987).

### B. Unopposed Motion for Summary Judgment.

Because Mr. Burton has not responded to defendants' motion for summary judgment and because the undisputed material facts reveal that defendants are entitled to judgment as a matter of law defendants' motion for summary judgment should be granted. It is not necessary to discuss the motion further, nonetheless an abbreviated analysis of the merits follows.

### C. Merits.

#### 1. Official Capacity Presumed.

Burton has not indicated whether he is suing the defendants in their official or their individual capacities. State officials may be sued in their official capacities, their individual capacities, or both. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). State officials sued for monetary relief in their official capacities, however, are not "persons" subject to § 1983 liability because suits against these people in their official capacities are in reality suits against the state itself. Will v. Michigan Dept. of State Police, 491 U.S. 58, 64 & 70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Unless a Plaintiff expressly states in his pleadings that his suit against a public official is in the public official's individual capacity, it will be assumed the defendant is sued only in his official capacity. Johnson, 172 F.3d at 535. In this case, Plaintiff does not specify whether he intends to sue Defendants in their official or individual capacities. It is presumed, therefore, he intended to sue them in their official capacities only, thereby barring any claim against them for monetary damages. His parole prevents prospective injunctive relief. Smith v. Boyd, 945

F.2d 1041, 1043 (8th Cir. 1991). Burton did not request relief in either the form of compensatory damages or injunctive relief, but in either event as a matter of law he cannot prevail.

### 2. Failure to Allege Facts Which Amount to a Constitutional Violation.

Judges are directed to first consider whether the allegations amount to a constitutional violation when addressing the defense of qualified immunity. Patel v. U.S. Bureau of Prisons, —F.3d. — , 2008 WL 281912, *3 (8th Cir. 2008). Because Burton has not established any constitutional or statutory violations, further inquiries need not be engaged. Id. Against Muller, Burton alleged that Muller retaliated against him by issuing a disciplinary report that he was sleeping during a room inspection. The report was based on an actual violation of prison rules. An inmate cannot pursue a claim for retaliation when the action being challenged was the result of violating prison rules. Cowans v. Warren, 150 F.3d 910, 912 (8th Cir. 1998). A second claim against Muller is that he shredded one of Burton's grievance forms. The undisputed fact is that Muller did not shred Burton's grievance form. Burton has not presented facts which amount to a constitutional violation by Muller.

Against Hooker, Burton claims Hooker threatened to have the lawyer fired who assists prisoners in the event Burton delivered some legal papers to the lawyer. The lawyer is Sonny Walter who has filed an affidavit confirming that he did not at any time refuse to provide Burton with legal assistance based on any comments by Hooker. Hooker never had a conversation with Burton in which Hooker said he would have Walter fired if Burton gave any legal paperwork to Walter. Burton loses his claim because his factual predicate does not exist. Burton has not presented facts which amount to a constitutional violation by Hooker.

## CONCLUSION

It is **RECOMMENDED** that defendants' motion for summary judgment should be **GRANTED** because the motion is unopposed. Mr. Burton has been paroled. On the merits of his retaliation claim, he has failed to state facts which amount to a constitutional violation. It is further **RECOMMENDED** the case be dismissed with prejudice.

Dated this 4th day of March, 2008.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, CLERK

By: Shelly Margulies, Deputy